**Not for Publication**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | |
| **ANTHONY FRANKLIN,** | : | **Civil Action No. 15-0891 (ES)** |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| **PATRICK NOGAN, et al.,** | : | |
| | : | |
| Respondents. | : | |
| | : | |

**SALAS, DISTRICT JUDGE**

## I.      INTRODUCTION

Petitioner Anthony Franklin ("Petitioner"), a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has filed a *pro se* Petition (D.E. No. 1) for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons explained in this Opinion, the Court will deny the Petition and will also deny a certificate of appealability.

## II.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division, upon Petitioner's direct appeal.[1] (D.E. No. 6-41 at 4-5).

> The convictions arise out of a confrontation between defendant and Jermaine Roberts outside of the Cheetah Club in Paterson on March 26, 2000. As the Club was closing at approximately 2:00 a.m., defendant approached Roberts, and a tussle ensued, during which defendant used his gun in an attempt to hit Roberts. Thereafter, defendant shot Roberts in the back as Roberts attempted to flee the attack. Defendant handed off the gun to Jamie Wilson and departed for South Carolina, where he was eventually apprehended and returned to New Jersey. Roberts died approximately three hours

---

[1]      The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

after being shot. Portions of the events that occurred outside the Club were recorded by the Club's exterior video camera, but not the shooting. Nonetheless, by viewing the videotape, the police were able to identify defendant and a number of witnesses, including a friend of Roberts, Darrell Bethune, and also including friends of defendant, Malik Porchea, Tonya Hogan, Jimmie Frierson, and Jamie Wilson. Those witnesses were later interviewed and gave statements implicating defendant.

Following an initial trial and conviction for murder, defendant appealed, and we reversed, finding that the trial judge erred in failing to instruct the jury on murder's lesser included offenses. Upon retrial before the same judge, the State's witnesses diluted their testimony, claimed a lack of memory of the events, or refused to testify. With the exception of Wilson, their prior statements and trial testimony were utilized at the second trial pursuant to <u>N.J.R.E.</u> 803(a) and 804(a) and (b).

*State v. Franklin*, 2009 WL 3488400, at *2 (N.J. Super. Ct. App. Div. Oct. 30, 2009).

The Appellate Division affirmed Petitioner's subsequent conviction for aggravated manslaughter but remanded for resentencing pursuant to *State v Pierce*, 188 N.J. 155 (2006). *Id.* at *1, 7. On February 2, 2010, the remand court entered a new judgment of conviction ("JOC"), and Petitioner was sentenced to an aggregate fifty-five year[2] term of imprisonment subject to the No Early Release Act (NERA), NJSA § 2C:43-7.2, requiring Petitioner to serve 85% of the sentence without parole eligibility. (*See* D.E. No. 6-45). The New Jersey Supreme Court denied certification on February 3, 2010. *State v. Franklin*, 989 A.2d 1264 (N.J. 2010).

Petitioner then filed a petition for post-conviction relief ("PCR") on March 4, 2010, which resulted in an evidentiary hearing in December 2011, before he was denied relief. (*See* D.E. Nos. 6-46, 6-38, 6-39, 6-40). Judge Raymond A. Reddin adjudicated the PCR matter, as Judge Ronald G. Marmo, who presided over both the first trial and retrial, had since retired. On June 6, 2014,

---

[2]     The  JOC indicates that the sentence on count three (unlawful possession of a weapon) is concurrent to count one, but the parties' filings and the Appellate Division opinions state otherwise. Moreover, New Jersey law prohibits "unlawful possession of a firearm [charges to merge] with a conviction for a substantive crime involving the use of that firearm." *See Franklin*, 2009 WL 3488400, at *8 (citations omitted).

the Appellate Division affirmed the PCR Court's decision.  *See State v. Franklin*, 2014 WL 2533802 (N.J. Super. Ct. App. Div. June 6, 2014).

On November 14, 2014, the New Jersey Supreme Court denied Petitioner's petition for certification.  *State v. Franklin*, 103 A.3d 266 (N.J. 2014).  Petitioner filed the instant petition for habeas relief under § 2254 on February 5, 2015.  (D.E. No. 1).  Respondents filed their full Answer on May 28, 2015.  (D.E No. 14).  Petitioner filed a traverse on June 29, 2015.  (D.E. No. 15).  The matter is fully briefed and ready for disposition.

## III.     STANDARD OF REVIEW

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Petitioner has the burden of establishing each claim in the petition.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts.  *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). If a decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA necessarily apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. 2254(b)(1)(A). To do so, a petitioner must "fairly present' all federal claims to the highest state court before bringing them in a federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007)) (other citations omitted). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim and stating that "[under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

# IV. ANALYSIS

The Petition raises eight grounds for relief, five of which are raising claims of ineffective assistance of trial and/or appellate counsel. For the reasons explained in this section, the Court finds that Petitioner's claims do not warrant federal habeas relief.

## A. Trial Court's Denial of Petitioner's Motion for Recusal

Petitioner argues that the trial court's denial of his motion for recusal was erroneous. (D.E. No. 1 at 23-26). Specifically, he argues that the trial judge should have recused himself from presiding over the retrial in light of his belligerence towards Petitioner during the first trial and his continued hostility towards Petitioner during the retrial and its related pre-trial proceedings. (*Id.*)

The Fourteenth Amendment's Due Process protections encompass the right to a fair and impartial trial. *In re Murchison*, 349 U.S. 133, 136 (1955). The issue of recusal is implicated when there is a potential for bias against the defendant from the judge. *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1977).

The PCR court deemed this claim to be unmeritorious. (D.E. No. 21-1 at 11). Moreover, the PCR court determined that the claim was sufficiently addressed by the Appellate Division during the course of Petitioner's direct appeal. (*Id.*)

Petitioner first moved for recusal during the pendency of his first trial. That motion was denied by Judge Marmo. Judge Marmo, who once again presided over Petitioner's case, denied a subsequent motion for recusal in the months leading up to Petitioner's retrial. (D.E. No. 6-14 at 9). The judge addressed what Petitioner perceived to be a prior tense exchange between himself and the trial judge outside of the presence of the jury during the first trial.[3] (*Id.* at 14-15). The judge acknowledged that he was dismayed by witness recantation during the first trial and that he

---

[3]     Petitioner describes a "stare-down" between himself and Judge Marmo during the first trial.

stated this directly to the defendant outside of the presence of the jury. (*Id.* at 13-15). Moreover, the judge pointed out that the Appellate Division did not address the matter of recusal or assign the matter to a different judge, therefore implying that the record did not reflect bias on Judge Marmo's part. (*Id.* at 11-12). Finally, the trial judge stated that his decision to not provide the lesser included charges of murder to the jury at the close of the first trial was in response to Petitioner's emphatic request that lesser-included offenses of murder not be provided.[4] (*Id.* at 15-19; *see also* D.E. No. 6-8 at 54-56).

This Court agrees that the trial court's decision to deny the motion for recusal was not improper. The record reflects that Judge Marmo did articulate his impression of some of the events of Petitioner's first trial. . (D.E. No. 6-14 at 12-18). Despite Petitioner's arguments that Judge Marmo's comments were biased, the Court notes that any perceived comments were always made outside the presence of the jury. *See Toribio v. Pine Haven LLC*, *et. al.*, 672 F. App'x 198, 200-01 (3d Cir. 2016) (determining that allegedly biased comments made by judge outside the jury's presence could not have influenced their verdict). Furthermore, Judge Marmo's comments were not a result of extrajudicial bias. Extrajudicial bias is "bias that is not derived from the evidence or conduct of the parties that the judge observes in the course of the proceedings." *Johnson v. Trueblood*, 629 F,2d 287, 291 (3d Cir. 1980).

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

*Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (holding that recusal of federal judges under 28 U.S.C. § 455(a) was subject to the "extrajudicial source" doctrine).

---

[4] Petitioner and counsel requested that the first trial court not instruct the jury on the lesser-included offenses of murder.

The state court's application of clearly established federal law was not unreasonable. The trial judge had plenty to observe over the span of a murder prosecution and from time to time articulated his observations on the record. The comments in no way suggested impartiality or bias against the defendant. *Johnson v. Carroll*, 369 F.3d 253, 263 (3d Cir. 2004) ("[M]ere appearance of bias on the part of a state trial judge, without more, [does not violate] the Due Process Clause.") For the foregoing reasons, the Court denies relief on this ground.

## B.   Illegal Sentence

Petitioner asserts two challenges to his sentence. First, that the extended term on the aggravated-manslaughter count was improper. The state court did not address this claim. Second, that the sentence was in violation of *North Carolina v. Pearce*, 395 U.S. 711 (1969). (D.E. No. 1 at 28-29).

After the Appellate Division remanded Petitioner's case to the trial court for resentencing pursuant to *State v. Pierce*, 642 A.2d 947 (N.J. 1994), the amended JOC provided, with respect to the aggravated manslaughter charge (count one), fifty years imprisonment with eighty-five percent of thirty years to be served before parole eligibility because the offense fell within the eighty-five percent rule of the No Early Release Act, NJSA § 2C:43-7.2. (D.E. No. 6-45). The possession of a weapon for unlawful purpose charge (count two) was merged into count one. On the unlawful possession of a weapon charge (count three), the court imposed five years imprisonment to run consecutive with the sentence imposed in count one.[5] On the hindering apprehension charge (count four), the court imposed five years imprisonment to run concurrent with counts one and three. Finally, on the certain persons not to have weapons charge (count seven), the court imposed five years imprisonment to run concurrent with counts one, three, and four. Petitioner was also

---

[5]    *See Supra* at note 2.

sentenced to a five-year parole term to begin after his prison sentence is served. *Id.* Petitioner's aggregate sentence was fifty-five-years imprisonment in comparison to the sixty-five-year sentence imposed after the first trial.

A federal court's ability to review state sentences is limited to "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies." *Briscoe v. Ricci*, No. 08-1697, 2009 WL 1097870 at *4 (D.N.J. Apr. 23, 2009) (quoting *Grecco v. O'Lone*, 661 F. Supp. 408, 415 (D.N.J. 1987)). In light of this, Petitioner's challenge to the state court sentence can only be reviewed if it violates a federal constitutional right. *Id.*

Implicit in Petitioner's argument is the premise that the sentence imposed after his second trial was higher than that imposed after the first trial. (*See generally* D.E. No. 1). This is not so. Petitioner received a lengthier sentence after the first trial than he did after the retrial. To the extent that Petitioner is arguing that the second sentence was excessive despite being convicted of a lesser included offense of aggravated manslaughter the second time around, his sentence is not the cruel and unusual punishment proscribed by the Eighth Amendment. *See United States v. Miknevich*, 638 F.3d 178, 186 (3d Cir. 2011) ("[S]entence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment.") (citations omitted); *see also* NJSA § 2C:43-7.2 (a person convicted of aggravated manslaughter and sentenced to an extended term shall be sentenced for a specific term of years between thirty years and life imprisonment).

As for Petitioner's argument that the sentence violates *North Carolina v. Pearce*, 395 U.S. 711 (1969), that claim is further discussed in the analysis of Petitioner's ineffective-assistance-of-appellate-counsel claim. *See infra* Part IV.D.

## C.    Trial Court's Denial of Right to Self-Representation

Petitioner claims that the trial court violated his Sixth Amendment right to self-representation despite his multiple requests to proceed *pro se*. (D.E. No. 1 at 30-31). The PCR Court rejected Petitioner's argument, determining that the record reflected Petitioner's constant vacillating between allowing counsel to make arguments on his behalf and addressing the court on his own, but never an explicit request to represent himself. (D.E. No. 6-40 at 36-37).

The right to self-representation is guaranteed by the Sixth Amendment to the United States Constitution as well as the New Jersey Constitution. U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10. The clearly established federal law for claims alleging denial of the right to self-representation was articulated by the United States Supreme Court in *Faretta v. California*, 422 U.S. 806 (1975). This right is afforded to a defendant who voluntarily, knowingly, and intelligently chooses to do so, and the state may not constitutionally force a lawyer upon him. *Id.* at 834-35. *Faretta* and its progeny of cases provide that a defendant must unequivocally assert his right to self-representation in a timely manner and the trial court must then conduct a colloquy with the defendant to determine that the waiver of counsel is knowing and voluntary. *Buhl v. Cooksey*, 233 F.3d 783, 791 (3d Cir. 2000).

Petitioner's first supposed request to proceed *pro se* occurred at a pre-trial hearing on November 16, 2005. (D.E. Nos. 1 at 30, 6-14 at 49). The brief exchange, at the end of a comprehensive hearing, was rather vague.

> THE COURT: What is the next matter that we have?
> MR. RANGES: Judge, Mr. Franklin has asked for - -
> THE DEFENDANT: To release my attorney.
> MR. RANGES: Mr. Franklin has asked for daily transcript during the course of the trial.
> THE COURT: Yeah.
> THE DEFENDANT: My attorney is incompetent. I want the first prongs in <u>Shirkin</u>. He doesn't know any case law.
> THE COURT: Okay. What about that, do you want to be heard on that application?

> MR. LOUKEDIS: I presented that application. I think Mr. Franklin presented it to Mr. Dwyer. If not, I did. Mr. Dwyer is the one who makes that decision, your Honor, and I believe Mr. Dwyer addressed that matter to Mr. Franklin.
> THE DEFENDANT: No. He never stop lying. No, he didn't.
> MR. LOUKEDIS: Well, then I could be mistaken. But if he didn't, my understanding is that it's not going to be ordered, daily copy. If he didn't address it, then he told me he was going to but apparently he didn't. So Mr. Franklin didn't receive the notice he's not going to order it.

(D.E. No. 6-14 at 49).

Momentarily after the preceding exchange with the judge, Petitioner informed the court that he would, through counsel, appeal the court's evidentiary ruling denying his motion to suppress the warrant. (*Id.* at 52).

Petitioner claims that his next request to proceed *pro se* at his January 3, 2006, pre-trial hearing was equally denied. At this hearing, Petitioner's counsel and the trial judge were engaged in a colloquy during which Petitioner repeatedly interjected. Petitioner asserted his "right to have his voice heard apart from counsel" on the issue that was currently before the court. (D.E. No. 6-15 at 14). Trial counsel eventually requested that Petitioner be allowed to address the court or "represent himself on a limited basis" so long as the jury was not present. (D.E. No. 6-16 at 12). In light of trial counsel's argument, the judge permitted Petitioner to make legal arguments in support of his objection to the hindering apprehension jury instruction. (*Id.*)

The PCR court considered the two instances of supposed pleas to proceed *pro se* cited by Petitioner in the instant petition as well as other occurrences where Petitioner either addressed the court directly or objected to testimony. (D.E. No. 6-40 at 36-37).

> Petitioner never specifically requested that his attorney be discharged, but rather that he be allowed to supplement the record when he sought fit. In the January 4, 2006 transcript again Petitioner appeared to want to supplement the record and be heard, but never requested to discharge his attorney. In fact, trial counsel requested that Petitioner be allowed to make certain remarks that trial counsel

could not or would not say. See <u>Transcript</u> dated January 4, 2006, 12:12-16.

Judge Marmo allowed Petitioner to make some remarks. Under <u>State v. Pratts</u>, 145 <u>N.J. Super.</u> 79 (App. Div. 1975) while allowing a defendant to make remarks is allowed and remains in the discretion of the judge, this type of action is to be avoided whenever possible [sic] <u>Id.</u> at 89. Accordingly, citing <u>State v. Sinclair</u>, 49 N.J. 525, 551-552 (1967) the court in Pratts states; "[w]hen a defendant represented by counsel seeks to participate in the conduct of the case, he may do so only with the permission of the judge. Such joint action is to be avoided wherever possible." <u>Pratts</u> at 89.

(D.E. No. 21-1 at 12).

The state court's application of established federal law was not unreasonable. The state repeatedly mentioned both in its oral and written PCR decision that Petitioner's multiple interjections did not amount to a clear, unequivocal request to proceed *pro se*. *See Brown v. Wainwright*, 665 F.2d 607, 609-10 (5th Cir. 1982) (holding that defendant waived right to self-representation by failing until the third day of trial to renew a pre-trial request to proceed *pro se* and by accepting the services of counsel until that time). Moreover, this Court agrees that Petitioner's statements demonstrate, at best, Petitioner's desire to supplement the record with additional legal arguments and motions. For these reasons, Petitioner's Sixth Amendment rights were not violated and habeas relief is not warranted on this ground.

D.        **Ineffective Assistance of Counsel**

Petitioner next asserts that he received ineffective assistance of counsel from both trial and appellate counsel. The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. This requirement involves demonstrating that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* Second, the defendant must

show that he was prejudiced by the deficient performance. *Id.* This requires showing that counsel's errors deprived the defendant of a fair trial. *Id.*

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance." *Id.* at 690. In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In addition, judges must consider the facts of the case at the time of counsel's conduct and must make every effort to escape what the *Strickland* Court referred to as the "distorting effects of hindsight." *Id.* The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 394.

When assessing an ineffective-assistance-of-counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective-assistance-of-counsel claims is thus "doubly deferential." *Id.* (quoting *Pinholster*, 131 S. Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged

deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

### 1. *Ineffective Assistance of Trial Counsel for Failure to Explain the Potential Sentencing Exposure for the Aggravated Manslaughter Charge*

Petitioner alleges that he was deprived of his Sixth Amendment right to counsel due to his retrial counsel's failure to advise him of his sentence exposure if convicted of the lesser included offense of aggravated manslaughter. (D.E. No. 1 at 33-35). Petitioner contends that counsel's deficient performance led him to decline a plea offer that would have resulted in a twelve-year sentence, instead of the one imposed after his jury trial. (*Id.* at 34). The instant habeas petition only references his plea discussions with his retrial counsel, Constantine Loukedis. However, the Respondent and the state courts cite to both the first trial counsel, Craig Weis's, and retrial counsel's efforts to properly convey the sentencing possibilities.

Petitioner first raised this ineffectiveness claim before the PCR court. In his PCR petition, he argued that he was not aware of the sentence exposure and that he was extended-term eligible because of his criminal history. (D.E. No. 6-46 at 8). The PCR court determined that the record reflected Petitioner was actively involved in his trial defense and that he was aware of the possibility of an extended term. (D.E. No. 21-1 at 9-10). The PCR court found Petitioner's retrial counsel's testimony about plea bargain discussions to be credible and at odds with Petitioner's claims that he did not realize the potential sentencing range. (D.E. No. 23-3 at 30-31). The Appellate Division affirmed the PCR court's denial. *Franklin*, 2014 WL 2533802 at *2.

The PCR court reviewed the first and second trial record before determining that Petitioner was aware of his sentencing exposure before denying plea offers prior to both trials. (D.E. No. 6-40 at 28-30). Moreover, the PCR court was not convinced by Petitioner's argument that he was

not aware of the potential for an extended term if convicted of the lesser included offense of aggravated manslaughter. (*Id.* at 30). The PCR court was also swayed by retrial counsel's testimony indicating that Petitioner entertained a twelve-year sentence plea offer prior to the retrial, which Petitioner ultimately rejected before deciding to stand trial. (*Id.* at 29).

Ineffective assistance of counsel claims arising out of the plea process are analyzed under the *Strickland* standard. *Hill v. Lockhart*, 474 U.S. 52 (1985). Claims of ineffective assistance of counsel in the context of a defendant rejecting a plea offer are considered under the standard set in *Lafler v. Cooper*, 566 U.S. 156 (2012). The Court in *Lafler* considered the claims of a petitioner who was allegedly advised by trial counsel to reject the plea offer based on the likelihood of his acquittal at trial. 566 U.S. at 163. First, as with all ineffective-assistance-of-counsel claims, the petitioner is required to show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. Secondly, the petitioner must show that the deficient performance was prejudicial. *Id.* The petitioner's showing that "the outcome of the plea process would have been different with competent advice" is dipositive in establishing *Strickland's* prejudice requirement. *Lafler*, 566 U.S. at 163. "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992).

The two salient factors in the PCR court's decision were: (i) the jury charge conference and colloquy during the first trial; and (ii) the testimony from both Petitioner and retrial counsel, Constanine Loukedis, at the PCR evidentiary hearing. (D.E. Nos. 21-1 at 32-33, 6-40 at 29-30).

During Petitioner's first trial, the judge held a charge conference before the case was submitted to the jury. (D.E. No. 6-8 at 46-56). At this conference, the Petitioner indicated that he was not interested in the lesser included offenses of murder to be provided to the jury. (*Id.* at 54).

THE COURT:  Do you want to voir dire the defendant?

MR. WEIS:  I've seen you at the jail on several occasions, it that correct?

THE DEFENDANT:  That's correct.

MR. WEIS:  As well as I was talking to you this morning about the charge, correct?

THE DEFENDANT:  That's correct.

MR. WEIS:  And I've explained to you murder, aggravated manslaughter, manslaughter, and the different elements, is that correct?

THE DEFENDANT:  Yes, that's correct.

MR. WEIS:  But if you asked my opinion, I think it's murder or nothing, right?

THE DEFENDANT:  Yes.

MR. WEIS:  You told me, and I want you to tell the Court, that you agree with that, and that is what you are asking me to do?

THE DEFENDANT:  Absolutely.

MR. WEIS:  That's what you want the Court to do?

THE DEFENDANT:  Yes, that's correct.

MR. WEIS:  You don't want any lesser includeds at all?

THE DEFENDANT:  That's correct.

MR. WEIS:  You understand - - and I'll put this on the record, Judge - - we've discussed possible convictions, correct?

THE DEFENDANT:  Yes.

MR. WEIS:  We've discussed a scenario where if you are convicted of the weapon, you are certain persons extended term and you're facing 20, right?

THE DEFENDANT:  Yes.

MR. WEIS:  Your position is 30, 20, it's the rest of your life and your child is grown and you're in your fifties and it's over, correct?

THE DEFENDANT:  That's correct.

MR. WEIS:  You don't want the lesser includeds, right?

THE DEFENDANT:  Not at all.

MR. WEIS:  You know that if you go down on murder, you know what's going to happen, right?

THE DEFENDANT:  Yes.

MR. WEIS:  Knowing all that, you are asking this Court to charge nothing but murder, is that correct?

THE DEFENDANT:  Yes, that's correct.

THE COURT:  Do you understand that the options for reckless take you all of the way down to ten years?  Reckless manslaughter is ten years, five to ten years?

THE DEFENDANT:  Yes, I understand that.

THE COURT:  And murder is at the least 30 years without parole, and there's - - the State may ask for an extended term here, and that's 35 without parole.

THE DEFENDANT:  Yes, I understand.

THE COURT:  Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  So it is a real big gamble that you are taking here by saying to the jury, look, maybe the murder case is weak and you are not able to go with it, but I don't want you to have any other option other than "not guilty," and that's what your strategy is?

THE DEFENDANT:  Yes, that's correct.

THE COURT: But the jury may say, look, we're not going to say "not guilty," and so we're going to go with murder. Somehow or other they might rationalize or come up with a compromised verdict, even if they don't feel that this was a reckless act, and they might say, you know, because we get the sense that Captain was not the pillar of the community or these other witnesses or people we don't have total confidence in, for whatever reason, and we're going to strike a compromise here and make it something less than murder. It could go all of the way down to reckless manslaughter, which would be an exposure of five to ten years. Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: Of course, the extended term applies to all these things, and your record is going to be a big factor if there is going to be a sentence. Are you sure that you want to do this?

THE DEFENDANT: Yes, your honor.

THE COURT: Take this huge gamble?

THE DEFENDANT: Yes, sir. Absolutely.

THE COURT: All right. Here is what I want - - well, I want you to think about it overnight, because I really think that the most compelling part about this is the fact that this is a case where it's hard to find recklessness, and it should be your decision if you want to take this monumental gamble.

THE DEFENDANT: Yes, your Honor. Do you mind if I address the Court?

THE COURT: Yes, go ahead.

THE DEFENDANT: I would like you to make a decision on it now. My mind is made up. I would rather have it murder in the first degree or nothing at all. I don't need any time to think about it for the record.

(D.E. No. 6-8 at 54-56).

The PCR court highlighted the first trial court's on-the-record inquiry of whether Petitioner understood the potential sentence consequences should Petitioner be convicted of murder at trial:

> Petitioner was asked if he understood that if convicted of the weapon offense he was a certain person not to have a weapon and would be facing an extended term of 20 years. He stated "Yes." Additionally, when questioned by the Judge regarding the lesser included offense, the Judge explained the different offenses and how they would decrease the number of years he was sentenced to if convicted of a lesser included. Petitioner stated that he understood. Moreover, Judge Marmo informed him what the sentence would be for murder and that the State has the right to ask for an extended term. The Court also mentioned if he was tried with the lesser included offenses the extended term applies to all offenses and his record would be a big factor in the sentencing. Petitioner, when asked again, if this is what he wanted, said yes. Petitioner was fully aware of the exposure he was facing.

(D.E. No. 21-1 at 9-10).

The PCR court next considered the evidentiary-hearing testimony, particularly that of Petitioner's retrial counsel. At the hearing, counsel testified that he did not recall whether he articulated the exact sentence range that Petitioner could face if convicted after a trial. (D.E. No. 6-39 at 9). However, counsel testified that he found a note in his case file that read "if he went to trial, he would be maybe 95 when he got out of prison." (*Id.*). Counsel testified that he did not recall whether he communicated that information to Petitioner either. (*Id.*) Counsel proceeded to testify that although Petitioner repeatedly eschewed any possibility of pleading guilty, Petitioner did entertain a twelve-year plea offer prior to the 2006 retrial. (*Id.* at 11, 14-15). Ultimately, Petitioner rejected the twelve-year plea offer, explaining to counsel that he thought nine years was a more appropriate sentence. (*Id.* at 14).

The PCR court opined in its oral and written decisions that, notwithstanding retrial counsel's oversight in articulating a potential sentence range, the record reflected that Petitioner was aware of the potential severity of the sentence. (D.E. Nos. 21-1 at 9, 6-40 at 29). Moreover, the state court viewed Petitioner's 2006 plea bargain discussions with his counsel as demonstrative of his comprehension of his sentence exposure. (D.E. No. 6-40 at 29). The Appellate Division affirmed the PCR court's denial of relief on this claim for the reasons expressed by the PCR court.

This Court finds that Petitioner has not demonstrated that the state court decision was unreasonable. *Matteo v. Superintendent*, 171 F.3d 877, 891 (3d Cir. 1999). The record supports Petitioner's submission that he may have not been explicitly informed of his sentence exposure for the aggravated manslaughter charge. However, the 2003 charge conference, where Petitioner unequivocally rejected any lesser included offenses of murder, prompted the concerned judge to repeatedly stress the consequences of that decision. While neither the trial judge nor counsel

explained Petitioner's potential exposure for every lesser included offense of murder, they did explain it for a few. The charge conference colloquy establishes that Petitioner understood that his sentence exposure was potentially significant, even if he was not convicted of murder. For example, his counsel explained that he faced up to twenty years of incarceration if he was convicted of the unlawful possession of a weapon certain persons charge. Moreover, the trial court stressed that his prior record would have a significant effect on his sentence even if he were convicted of a lesser included offense. Therefore, Petitioner, who had the benefit of a thorough charge conference before the close of his first trial coupled with the experience of having been convicted of murder and receiving a more severe sentence than the one he now contests, undermines his claim that he was ignorant of his possible sentence exposure if he went to trial a second time.

Even if this Court were to determine that retrial counsel's performance was deficient, the record of the 2003 charge conference and retrial counsel's testimony about Petitioner's resistance to a twelve-year plea offer reflects that Petitioner was aware of his sentence exposure and was not prejudiced by counsel's supposed deficiency. *Afolabi v. United States*, No. 13-3396, 2016 WL 450118 at *7 (D.N.J. Feb. 4, 2016) ("Because it is clear from counsel's testimony that Petitioner had no intention of accepting the plea agreement which was offered by the Government, Petitioner is incapable of showing that she was prejudiced by counsel's advice in regards to the plea.") (citations omitted).

Therefore, Petitioner is not entitled to federal habeas relief on this claim.

### 2. *Ineffective Assistance of Trial Counsel for Failure to Investigate Potentially Exculpatory Witnesses*

Petitioner alleges that he was denied his Sixth Amendment right to counsel due to trial counsel's failure to investigate potentially exculpatory witnesses such as Keshon Roberson. (D.E.

No. 1 at 36-38).  Additionally, Petitioner alleges in a separate claim that Keshon Roberson's trial testimony should have been considered as a statement against penal interest at his retrial.  (*Id.* at 39).  This Court will address both of these claims below.

Petitioner claims, as he did in the PCR proceeding, that trial counsel failed to investigate Roberson, among others, despite evidence from the first trial that allegedly implicated someone other than Petitioner as the fatal shooter.  (*Id.* at 37).  The PCR court deemed the claim unmeritorious and the Appellate Division agreed for the same reasons.  (*Id.* at 7-10).

At Petitioner's first trial, Keshon Roberson, an acquaintance of Petitioner[6] and nemesis of the decedent[7], testified as a defense witness about the early morning hours of March 26, 2000, and the events leading up to Jermaine Roberts's death.  (D.E. 6-9 at 35-57).  Roberson, who asserted his Fifth Amendment right when asked if he possessed a gun at the time of Roberts' shooting, was granted immunity and testified that he had a gun at the time of the shooting.  (*Id.* at 38-39, 44-45).  On cross-examination, Roberson was impeached by statements he provided shortly after the shooting as well as a statement he provided to the prosecution shortly before he took the witness stand.  (*Id.* at 46-54).  The fact that he never indicated having a gun on the night of the shooting was consistent in both statements but inconsistent with his trial testimony.

> Q:  Now, would you say your memory is better of the event now or was your memory of the event better back in 2000 when this happened?
> A:  No, probably now- - both times.
> Q:  Your memory is better now?  Over time your memory got a little better of what happened?
> A:  Ha?
> Q:  With time your memory got better of what happened?
> A:  Yeah, probably.  Yeah.
> Q:  Your memory works different than the rest of us?
> A:  No.  I don't know.
> Q:  Usually with time your memory starts to fade, right?

---

[6]    While testifying, Roberson refers to both Petitioner and decedent by their nicknames.  Petitioner's nickname is "Word" and decedent's nickname was "Captain."

[7]    Decedent had assaulted Roberson days before the fatal shooting.

A: Yeah.

Q: But you think your memory is better now, right?

THE COURT: You have to answer.

A: Yes.

Q: Is your memory better now, or do you think what people want to hear is better now?

MR. WEIS: Objection.

THE COURT: I'll allow it.

THE COURT: Do you understand the question?

THE WITNESS: Is my memory better or- -

Q: Do you actually remember it better or - -

A: 'Cause it's coming. Do you know what I mean? It's coming back, and it came back up and I'm remembering. Do you know what I mean? I'm remembering what's going on then.

Q: Keshon, before today I never met or spoke with you about this case, right?

A: No.

Q: I did meet and speak with you today though, right?

A: Yes.

Q: And that was just before you came out on the stand, right?

A: Yes.

Q: And we met in the holding cell?

A: Yes.

Q: In the holding area?

A: Yes.

Q: And there was another gentleman there with me, Mr. Latoracca?

A: Yes.

Q: We discussed with you what we thought you might testify to, right?

A: Yeah.

Q: How did I know what you were going to testify to? What did I go over with you?

A: You went over what happened.

Q: Okay. Where did I get that information from? Did I show you something?

A: Yeah, you showed me. Yeah, you showed me something, yeah.

Q: And what did I show you?

A: The statement.

Q: The statement that you gave, right?

A: Yeah.

Q: And where did you give that statement?

A: At Word's house.

Q: At Word's house, right?

A: Yeah.

Q: And when was that? Do you remember when it was?

A: It was a while ago.

Q: Let me show you what is marked S-30.

MR. RANGES: May I approach this witness?

THE COURT: Sure.

Q: Let me show you S-30 for identification. Grab that and take a look at that.

A: (Witness complies).

Q: Do you recognize it?
A: Yeah. Yeah, this is what you just showed me in there.
Q: That's what we just went over, right?
A: Yeah.
Q: When we went over that statement, did I ask you if you had a gun?
A: Yeah.
Q: And what did you tell me?
A: I told you no because I didn't want to be incriminated.
Q: You didn't tell me you were going to invoke your Fifth Amendment privilege?
A: I didn't say that, but I just told you no.
Q: Did you tell me you were going to invoke your Fifth Amendment privilege?
A: No, I didn't tell you that because - -
Q: You said no, right?
A: Yeah. No judge wasn't in there or nothing. I didn't know what I know now.
Q: You said no, you didn't have a gun right?
A: Yeah.
Q: Now today you are telling us that you saw Word and you saw Captain in a tussle, right?
A: Yeah.
Q: Back in 2000 when you gave that statement at Word's house did you say you saw him in a tussle?
A: No.
Q: No. Did you say you even saw them together?
A: No, I didn't. That's 'cause what I told you, though. I ain't thinking about it. He was asking questions so fast and I'm just answering them. And until I left, then I thought about it.
Q: And what was the question that he asked you that happened so fast that you couldn't understand it?
A: All these questions.

(*Id.* at 46-48).

Roberson was called again as Petitioner's witness at the PCR hearing. Roberson's testimony at the evidentiary hearing was completely at odds with that of retrial counsel's. Moreover, portions of Roberson's testimony were refuted by the record. (D.E. No. 6-38 at 13). At Petitioner's PCR evidentiary hearing, retrial counsel testified about his strategy to exclude Roberson from the defense's case.

Q: Are you aware that Roberson testified that at the time when he was in the crowd, he had a gun in his possession? Plain and simply that.
A: I understand the question. You're talking about his testimony in the first trial?
Q: Yes.

A:  I don't recall that.  But I'm sure - - I'm not disputing that he said that.  I have a faint recollection he may have admitted to having a gun that night.  I think that's true.

Q:  Did you ever interview Mr. Roberson?

A:  I did not.  I just based it on whatever he said based on his testimony in the trial or on his statement.

Q:  But if he had testified in that matter at the first trial that he was in the crowd with a gun, wouldn't it have been a good idea to have interviewed him?

A:  I think I did talk to Mr. Roberson.  I don't know if I took a formal statement from him or not.  But he was kind of equivocal.  I'm not sure if Roberson is the one who wanted immunity from testifying.  I'm not sure if he's the one.

Q:  Well, if he had been equivocal in the interview that you had with him, would it not remain the fact that such testimony is significant?

A:  That he had a gun also?

Q:  Yes.

A:  Well, no one else indicated that he was the shooter.  The shooter- - the defense of someone else could have fired the shots was not based on Roberson's presence at the scene

MR. McGUIGAN:  Excuse me, your Honor- -

A:  it [sic] was as far as - -

MR. McGUIGAN:  my [sic] question was- -

A:  If I may, with all due respect- -

THE COURT:  Why don't you finish your answer.

A:  It was - - my basis for the unknown shooter was - - and I don't mean this in demeaning of defense  - was a phantom shooter-, not anyone particular and certainly not Mr. Roberson.

Q:  You proposed a phantom shooter?

A:  Somebody who had it in for Mr. - - I'm sorry - - the victim, other than my client who's being accused of it.

Q:  So you did not think it advisable to put a possible face on the phantom?

A:  Yes, if I had - - if I had any type of basis, probable cause for doing that, I would have, yeah.  But Mr. Roberson did not fill the bill as far as I was concerned.

Q:  Were you aware that Mr. Roberson also testified that the victim sucker punched him two weeks before the incident?

A:  Sucker punched who, Roberson or Mr.  - -

Q:  Yes, sucker punched Roberson.

A:  That might have been there in the case.

Q:  But given that testimony from the earlier trial, you did not think it advisable that information should be presented on behalf of the defense?

A:  I didn't think there was any credibility to it.

Q:  How did you make that determination?

A:  Well, there's a number of factors based on my representing Mr. Franklin on two separate occasions[8] and I just didn't think it was helpful based on the other evidence in the case.

A:  Would not - - putting yourself at the scene of a homicide in possession of a gun, would that not be a statement against interest?

A:  Not necessarily, but it could be.

---

[8]     Loukedis represented Petitioner briefly during the pendency of the first murder prosecution in 2003.  That case was eventually tried by Craig Weis.  (D.E. No. 6-39 at 3).

Q:  Well, to the extent- - let's assume for a moment that it is against interest to put yourself at the scene of a murder with a gun.
A:  Yes.
Q:  Would not such a statement against interest have inherent credibility?
A:  Yes, I assume so.

. . . .

Q:  With regard to Mr. Roberson - - and I know there's a lot of names that are being thrown around- - do you recall Mr. Roberson appearing for the second trial when you were representing Mr. Franklin and discussing about wanting immunity before he would testify?
A:  I do.  I think it was out in the hall.
Q:  In the hall of the courtroom of the court?
A:  Yes.
Q:  Were you successful in persuading either the Court, if you recall, either the Court or the State to grant Mr. Roberson immunity?
A:  Not at all.
Q:  Did Mr. Roberson stick around at that point willing to give a proffer or do you recall what he did?
A:  He left.

(D.E. No. 6-39 at 7-9, 13).

As a preliminary matter, the PCR court found Roberson's trial testimony to be incredible.

The court summarized significant portions of Roberson's evidentiary-hearing testimony as well as

Roberson's testimony from Petitioner's first trial into the record, in order to underscore Roberson's

unreliability as a witness.  (D.E. No. 6-40 at 19-25).  It ultimately concluded that retrial counsel's

strategy to exempt Roberson from the defense's case was a sounder defense strategy than calling

him as a witness.

> Now I don't know if Mr. Loukedis sat down and formally interviewed this witness or not.  Personally - - and I tried cases from the defense perspective for 25 years before I became a judge. Personally I wouldn't even waste my time interviewing this witness on this testimony because the last thing I would do as defense counsel is put this witness on the stand because as a strategic call or a judgment call it seems to me his testimony is harmful to the defendant, his testimony hurts the defendant, his flip-flopping, his prior record.  He really wouldn't say anything unless he was given a free pass to say what he wanted.
>
> That's not the way a witness goes into the courtroom and testifies under oath and tells the truth.  Witness comes in, takes the oath and

> answers the question.  This witness says I'm not going to tell you anything unless you give me immunity first.  On top of it, he vacillates, flip-flops, he admits to taking drugs and he's got prior convictions.
>
> So I don't know if Mr. Loukedis interviewed him or not.  But it wouldn't surprise me if someone with Mr. Loukedis' experience said I'm not going to interview this guy 'cause the last thing I'm going to do is put him on the stand because he's going to bury you.  Notwithstanding that, Mr. Loukedis did mention that he did interview him.  And I submit that putting him on the stand is more consistent with ineffective assistance of counsel than not putting him on the stand, which brings me to a point that I might as well make now.

(*Id.* at 25).

The state court addressed Roberson's supposed self-inculpatory statement and his overall credibility as a witness before agreeing with counsel's decision to forego Roberson's testimony in the retrial:

> It was alleged by the petitioner that Mr. Roberson wished to be granted full immunity so he could testify that he was the shooter in the case.  However, the petitioner proffers nothing to support that Mr. Roberson was going to testify to that information.  Also, Mr. Roberson refused to testify unless he was granted immunity.  Additionally, it is extremely unlikely that the State would grant immunity to a witness who would confess to the crime and not have to suffer any consequences.  Beyond that, this court reviewed the testimony of Keshon Roberson in the first trial.  In this Court's opinion he was a horrible witness who lacked even a scintilla of credibility.  His testimony was a mockery of the truth and in this Court's opinion only a foolish, inept, or incompetent attorney would even consider calling him to the stand.  His testimony would have done extensive harm to whatever limited chance Defendant had to be acquitted.

(D.E. No. 21-1 at 31-32).

The state court's application of federal law was reasonable, particularly in light of the robust record highlighting Roberson's inconsistencies and overall incredibility.  "[C]omplete failure to investigate potentially corroborating witnesses" can arguably be considered ineffective

assistance.  *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (holding that counsel's failure to investigate any witnesses, despite his client's insistence that he not compel witnesses to testify at trial, fell below the minimum standard of reasonable representation).  However, the record reflects that counsel's decision to not pursue Roberson's testimony was not ineffective.  Counsel testified at the evidentiary hearing that he reviewed the first trial's transcript and also vaguely recalled speaking to Roberson at some point before the retrial.  The PCR court credited counsel's testimony and agreed that Roberson was a potential liability to Petitioner's case if called as a defense witness.  The state court's finding was not contrary to *Strickland*.  Retrial counsel's performance was not unreasonable under prevailing professional norms, and Petitioner failed to show a reasonable probability of a different trial outcome but for counsel's strategic decision.  *See Strickland*, 466 U.S. at 689.

Lastly, with respect to Roberson, Petitioner also claims that retrial counsel's failure to "advance Keshon Roberson's prior trial testimony as a declaration against penal interest" was ineffective assistance.  (D.E. No. 1 at 39).  Petitioner's argument is premised on the claim that Roberson implicated himself as the shooter responsible for Roberts' death when testifying at Petitioner's first trial and that Roberson was considered a suspect in the investigation stages of the case.  (*Id.*)

Petitioner's argument about Roberson's trial testimony (i.e., that Roberson had a gun on the night of Roberts's shooting) does not satisfy the criteria that a trial court considers when allowing this type of statement into evidence.  In turn, counsel's decision to not pursue putting Roberson's prior testimony in evidence at the retrial was not ineffective.

At Petitioner's first trial, Roberson testified that he was in possession of a gun on the night of Roberts' shooting.  Roberson provided this somewhat surprising testimony which resulted in

the prosecution's assurance that it would not seek to prosecute him for any testimony about gun possession on the night in question. Nonetheless, Roberson was impeached by prior statements he provided that never indicated that he possessed a gun at the time of Roberts' shooting. Roberson's trial testimony appeared to be undermined by his own prior statements and, more importantly, Roberson never admitted to firing the weapon or shooting Roberts.

Rule 804(c)(25) of the New Jersey Rules of Evidence provides for an exception to the inadmissibility of hearsay when the declarant is not available and a statement is against the declarant's interest. The rule permits the introduction of:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary or, social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true.

N.J.R.E. 803(c)(25).

The PCR court determined that counsel's failure to call Roberson on retrial, particularly in light of his troubling testimony at the first trial was not ineffective. The record reflects that Roberson's trial testimony was full of inconsistencies. Moreover, his testimony was not so unfavorable to his interest that it "deemed [declarant's statement] inherently trustworthy and reliable." *State v. White*, 729 A.2d 31, 36 (N.J. 1999) (citation omitted). To the contrary, Roberson asserted his Fifth Amendment privilege before even testifying about his gun possession and was subsequently granted immunity. Therefore, Petitioner's ineffectiveness claim on the basis of his counsel's failure to advance this testimony fails.

Petitioner also claims ineffective assistance because of trial counsel's failure to investigate or present the testimony of other exculpatory witnesses, specifically, ballistics experts. Petitioner initially raised this claim in his PCR petition as demonstrative of his counsel's failure to properly

investigate the case. (D.E. No. 6-46 at 6-7). Petitioner does not state in the instant petition what a ballistics expert's testimony would prove or disprove exactly, but he cites to an expert's PCR evidentiary hearing testimony, that he is now presumably arguing, established that his weapon was not the one that fatally shot Roberts. (D.E. No. 1 at 38).

At the PCR evidentiary hearing, ballistics expert Carl Leisinger was called to testify by Petitioner. (D.E. No. 6-39 at 18). Leisinger testified that it was unlikely that the shells coming from the type of weapon that was used to kill Roberts could have travelled a distance of twenty or thirty feet "and come to rest fairly close to each other." (*Id.* at 21). On cross-examination, the prosecution elicited from Leisinger that he was not aware of Petitioner's distance from the decedent at time of the shooting and he did not view the video depicting portions of the events surrounding the shooting. (*Id.* at 21-22). Moreover, the prosecution elicited the variables in the expert's testing such as the fact that it was conducted in a stationary position unlike Petitioner, who the evidence supports was most likely moving in the seconds leading up to the shooting. (*Id.*).

Retrial counsel testified that his trial strategy was to deny that Petitioner shot the decedent at all, therefore the ballistics expert's testimony was not critical to his defense. (D.E. No. 6-39 at 6).

> QUESTION: Now in your own -- in your own – so in the earlier trial I guess – I don't know that you specifically answered this – were you aware that in the earlier trial that it was argued that there was a distance between the shots – where the shell casings were found and where witnesses had placed him? Are you aware that that was basically the defense?
> ANSWER: I can't say that; I don't remember.
> QUESTION: But it was not your defense?
> ANSWER: No.
> QUESTION: And so you had another theory that you were pursuing? If so, what was that?
> ANSWER: Denial.
> QUESTION: Denial?
> ANSWER: That the alleged – the victim in this matter had many enemies. Anybody could have fired a gun that night. That was basically it.
> QUESTION: Did you argue in closing that the four shell casings had been fired when the defendant was struggling with the victim?

ANSWER:  I don't remember that, I don't.

QUESTION:  If you had, that would not be in keeping with the denial; correct?

ANSWER:  I'm sorry?

QUESTION:  If you had argued to the jury that the four shell casings were the result of the gun going off while the defendant struggled with the victim, if that was what you argued to the jury, is that in keeping with denial?

ANSWER:  I don't understand your question.

THE COURT:  He doesn't understand your question.  Why don't you repeat it.

QUESTION:  Did you argue to the jury that those four – that the shell casings were the result of the gun discharging during the struggle?

ANSWER:  No.

(*Id.*).

The state court agreed that trial counsel's representation could not be deemed ineffective because of his decision to not make the location of the shell casings the crux of his defense.

Petitioner contends that trial counsel was ineffective for his failure to investigate the claims of witnesses made during the first and second trial.  Specifically, that the petitioner could not have been the perpetrator, because he was involved in a "tussle" in the middle of the street, directly in front of the club.  Petitioner proffers that he could not have committed the shooting because four (4) shell casings were found on the sidewalk twenty or thirty feet away from where the "tussle" with the victim occurred.  Petitioner argues that multiple witnesses, even witnesses for the State, placed him in the street, in front of the club, not on the sidewalk where the casings were found.

However, there is no merit to this argument.  Defense trial counsel argued the location of the four shell casings in his summation.  Counsel further made a strategic decision not to limit the defense to the location of the shell casings.  Counsel, instead chose to strongly argue that a fifth shot, from another person's gun actually shot the victim, Mr. Roberts.  There was testimony from a police officer that he heard four or five shots.  Moreover, there is no evidence in the record that clearly puts the petitioner in the street in front of the club when <u>all</u> of the shots were fired.  There is testimony from the eyewitnesses that the fight started on the sidewalk, moved to the street, and then moved up the street towards Colt Street.  Darrell Bethune states he saw the petitioner with a gun and that he tried to hit the victim with it.  See <u>Transcript</u> dated May 16, 2006, Volume 1, 46:19-47:19.  After the fighting ensues, Mr. Bethune places the petitioner and the victim in the street and them moving toward Colt Street.  <u>Id.</u> at 107:23-109:8.  Additional witnesses state that the

petitioner was the only one seen with a gun that evening. The record is replete with testimony that upon the firing of the first shot everyone ran. There is a clear inference that once a shot was fired and everyone ran, no one was paying attention to the exact location of the defendant when the final four shots were fired. Therefore, it is clear that the evidence does not support the suggestion that Defendant remained in the street during the entire shooting episode.

There was additional testimony proffered in this case that supports the above. Based on the testimony presented to the jury, the jury found beyond a reasonable doubt that Petitioner was responsible for the killing. There was no ineffective assistance of counsel.

(D.E. No. 21-1 at 28-29).

The state court's application of federal law was not unreasonable, particularly in light of the overwhelming evidence that depicted Petitioner's location and actions in the seconds leading up to and during the shooting of the decedent. The trial evidence provided that four shell casings, all from the same firearm, were located within close distance of each other on the sidewalk of the street where the shooting occurred. (D.E. No. 6-25 at 44, 52). Multiple witnesses testified that Petitioner and decedent were in a fight in the street immediately before shots were fired. (D.E. Nos. 6-23 at 49-50, 6-29 at 15, 32, 6-37 at 36). Moreover, Petitioner's friend Malik Porchea testified that Petitioner and decedent were fighting on the sidewalk and it eventually "spilled out into the street." (D.E. Nos. 6-27 at 22-23, 6-28 at 1). Petitioner's contention is that the ballistics expert's testimony would have established that it could not have been his weapon that shot Roberts because the shell casings found on the sidewalk could not have been from a gun that was fired from a significant distance. Ultimately, Petitioner disregards that the record is rife with testimony that the shooting did not involve stationary actors. For one, the decedent was shot in the back as he was running from the shooter. (D.E. No. 6-29 at 32). Thus, even if Petitioner and decedent were initially in the street, the physical altercation and subsequent shooting could have moved to

the sidewalk. Therefore, the ballistics testimony does not establish that decedent could not have been killed by a gun fired by the Petitioner.

For the foregoing reasons, counsel's tactical reasons for not calling witnesses such as a ballistics expert do not amount to ineffective assistance. *Henderson v. DiGuglielmo*, 138 F. App'x 463, 469 (3d Cir. 2005) ("Counsel's failure to call a witness 'is precisely the sort of strategic trial decision that *Strickland* protects from second-guessing.'") (citation omitted).

For the foregoing reasons, Petitioner is not entitled to federal habeas relief on this claim.

### 3. *Ineffective Assistance of Trial Counsel for Incriminating Closing Arguments*

Petitioner asserts that trial counsel was ineffective for making supposedly incriminating statements during his summation. (D.E. No. 1 at 41-44). Specifically, Petitioner argues that counsel's characterization of the type of people that were at the crime scene was prejudicial and that counsel referenced incriminating testimony that was not in evidence. (*Id.* at 41-42).

> The right to effective assistance extends to closing arguments. Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,', but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas.

*Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (citations omitted).

The state court summarily denied Petitioner's claim and even identified counsel's argument that there was a second shooter that fired the fatal shot as a sound strategy that could have plausibly created reasonable doubt of the Petitioner's guilt.

> Trial counsel's closing argument was not inaccurate, speculative, illogical, and damaging as the petitioner alleges. In actuality, [t]rial counsel's summation was very well prepared in this Court's opinion. When counsel referenced that Petitioner was on the sidewalk, he was merely repeating what had been stated by several witnesses. Counsel cannot ignore the facts and inferences adduced at trial.

(D.E. No. 21-1 at 8).

A review of defense counsel's summation reveals that trial counsel did in fact address testimony that placed his client at the scene and arguably even engaged in a physical altercation with the victim, while still maintaining that Petitioner was not responsible for shooting the victim. (D.E. No. 6-32 at 10-13). Trial counsel referenced the state witnesses' testimony in the context of its unreliability. Moreover, Petitioner's argument that counsel's characterization of some of the people outside of the nightclub as "unsavory" prejudiced his defense fails. When considered within the context of the rest of counsel's summation, his characterization was meant to minimize his client's culpability by emphasizing the likelihood that others in the crowd that night could have been responsible for the shooting.

Here, the contested portions of counsel's summations were potentially advantageous to Petitioner's defense strategy and there does not appear to be any questionable statements from trial counsel in his summation. *United States v. Gray*, 878 F.2d 702, 710 (3d Cir. 1989) (holding that petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"). Therefore, the state court's analysis was not contrary to or an unreasonable application of clearly established federal law.

### 4. *Ineffective Assistance of Appellate Counsel for Failure to Raise Issues on State Direct Appeal*

Petitioner's final ineffective-assistance-of-counsel claim relates to appellate counsel's representation on direct appeal. Petitioner claims that counsel's failure to raise the trial court's

denial of his right to self-representation as well as the trial court's imposition of an excessive sentence was contrary to his request that counsel do so. (D.E. No. 1 at 32-33). On direct appeal, Petitioner raised the following claims: (i) the trial judge erred in denying defendant's motion for recusal; (ii) the trial judge erred in charging flight to the jury; (iii) the sentence was excessive; (iv) the discretionary extended term sentence violated *State v. Pierce*. *Franklin*, 2009 WL 3488400, at *1.

Ineffective assistance of appellate counsel is analyzed under the *Strickland* standard. *See Albrecht v. Horn*, 485 F.3d 103, 137 (3d Cir. 2007) (quoting *United States v. Mannino*, 212 F.3d 835, 840 n.4 (3d Cir. 2000)). The two-part *Strickland* test requires this Court to first determine whether counsel's performance was deficient, which in the context of an appeal requires evaluation of counsel's failure to raise proper issues on appeal. *See Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) ("[I]t is a well established principle that counsel decides which issues to pursue on appeal."). Secondly, Petitioner must show that but for his counsel's failure to raise the omitted issue, he would have prevailed on his appeal. *See Pichardo v. Nelson*, No. 13-6930, 2015 WL 9412918, at *11 (D.N.J. Dec. 22, 2015) (quoting *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). In order to do so, this Court must hypothesize whether the Appellate Division would have overturned on the basis of one or both of the omitted claims. *Id.* at *8.

a. Denial of Right of Self-Representation

As previously discussed, the right to self-representation is guaranteed by the Sixth Amendment to the United States Constitution as well as the New Jersey Constitution. U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10. Under New Jersey law, a trial court's denial of a defendant's request to represent himself is reviewed for abuse of discretion. *State v. Francois*, No. 08-10-1788, 2012 WL 4661667, *9 (N.J. Super. Ct. App. Div. Oct. 4, 2012).

The PCR Court determined that appellate counsel raised all "meritorious arguments available" before denying Petitioner's claim. (D.E. No. 21-1 at 13). The Appellate Division affirmed for the same reasons. (D.E. No. 21-1 at 43).

Here, the Court agrees that Petitioner cannot show that he was prejudiced in light of the fact that the claim was not viable. *See supra* Part IV.C. As such, Petitioner fails to show that the state court unreasonably applied *Strickland* or that the denial of this claim was the result of an unreasonable determination of the facts. The Court will therefore deny habeas relief on this ground.

      b.   Failure to Challenge the Extended Term Sentence

Petitioner also alleges that appellate counsel's failure to challenge the extended term sentence imposed as a result of judicial vindictiveness was ineffective.

After Petitioner's retrial and subsequent conviction for murder's lesser-included offense of aggravated manslaughter, the trial court once again imposed a discretionary extended term on the basis of Petitioner's "persistent offender" designation under New Jersey law. (D.E. Nos. 6-36 at 45, 6-13 at 6-8). At sentencing after his retrial, Petitioner conceded that it was a lesser sentence than that imposed after his first trial. (D.E. No. 6-36 at 63). Nonetheless, he now argues that it was an increased sentence, imposed as a result of the trial judge's vindictiveness. (D.E. No. 1 at 32). Construing Petitioner's claim liberally, his argument appears to be that it was a severe sentence notwithstanding the fact that on retrial, the jury convicted him of aggravated manslaughter as opposed to murder.

The Due Process protections of the United States Constitution prohibit judicial vindictiveness against a defendant "for having successfully attacked his first conviction . . . in the sentence he receives after a new trial." *Alabama v. Smith*, 490 U.S. 794, 798 (1989) (quoting

*North Carolina v. Pearce*, 395 U.S. 711, 725 (1969)).  The presumption of vindictiveness "may be overcome only by objective information in the record justifying the increased sentence." *Wasman v. United States*, 468 U.S. 559, 565 (1984).  The burden of proof falls on the prosecutor or sentencing tribunal when the presumption of vindictiveness applies.  *Id.* at 569.  Finally, the presumption of vindictiveness is not triggered "when the aggregate sentence is less than that originally imposed . . . . "  *United States v. Nerius*, 824 F.3d 29, 32 (3d Cir. 2016) (quoting *Kelly v. Neubert*, 898 F.2d 15, 16, 18 (3d Cir. 1990)).  "When there is no such reasonable likelihood [of judicial vindictiveness], the burden remains upon the defendant to prove actual vindictiveness." *Wasman*, 468 U.S. at 799-800.

Respondents submit that the No Early Release Act sentence after the second trial was not a result of judicial vindictiveness but rather "merely a function of the law as it existed at that time." (D.E. No. 14 at 27).

While the state court did not squarely confront the issue, it essentially concluded that Petitioner had not established a claim for ineffective assistance of his appellate counsel because he had not established any vindictiveness on the judge's part.  (D.E. No. 21-1 at 13).  This Court finds that the state court's decision was not an unreasonable application of *Strickland*, as appellate counsel's decision to forego raising meritless claims did not violate professional norms.  *See Sistrunk*, 96 F.3d at 670 (3d Cir. 1996) ("Appealing losing issues 'runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions.'") (citations omitted).  Thus, Petitioner is not entitled to habeas relief on this claim.

Accordingly, all of Petitioner's claims of ineffective assistance of trial and appellate counsel are denied.

## V.      CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied.[9]

## VI.     CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter.  *See* L. App. R. 22.1.  The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). Based on the discussion in this Opinion, Petitioner has not made a substantial showing of denial of a constitutional right, and this Court will not issue a certificate of appealability.  An appropriate Order follows.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

---

[9]      In light of the Court's denial of the instant habeas petition, the Petitioner's motion for summary judgment (D.E. No. 17) is denied as moot.